1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  NOAH STERN (CABN 297476)
   Assistant United States Attorney
5  BENJAMIN K. KLEINMAN (NYBN 5358189)
   Special Assistant United States Attorney
6
        1301 Clay Street, Suite 340S
7       Oakland, California 94612
        Telephone: (510) 637-3680
8       FAX: (510) 637-3724
        Noah.Stern@usdoj.gov
9       Benjamin.Kleinman2@usdoj.gov

10 Attorneys for United States of America

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                             OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JAVIER CASTRO BANEGAS-MEDINA et al.,<br><br>    Defendants. | Case No. 21-mj-70900-MAG<br>           21-mj-70903-MAG<br><br>MEMORANDUM IN SUPPORT OF GOVERNMENT'S MOTION TO DETAIN CASTRO, ROSALES-MONTES, CRUZ-CACERES, ROMERO-LOPEZ, AND LAUGHREN JR. |
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>KENY ALDUVI ROMERO-LOPEZ,<br><br>    Defendant. | |

MEM. ISO DETENTION MOTION
21-MJ-70900-MAG; 21-MJ-70903 MAG         1

# CONTENTS

I.   INTRODUCTION ................................................................................................................1

II.  BACKGROUND .................................................................................................................2

    A.   Law Enforcement Seizes 19 Kilograms of Fentanyl from CASTRO DTO.........................2

    B.   Law Enforcement Intercepted Wire Communications Regarding CASTRO DTO's Ties to Honduras ...........................................................................................4

    C.   After Their Arrests, Members of the CASTRO DTO Discuss Plan to Flee to Honduras .....................................................................................................................6

    D.   Law Enforcement Intercepts Wire Communications Regarding Firearms and Fentanyl ......................................................................................................................6

    E.   LAUGHREN's Routine Purchases of Fentanyl from the CASTRO DTO and Involvement with Firearms Trafficking .................................................................8

III. DISCUSSION ......................................................................................................................9

    A.   CASTRO, ROSALES-MONTES, CRUZ-CACERES, and ROMERO-LOPEZ Pose a Risk of Flight that Cannot be Mitigated by Conditions..........................................10

    B.   LAUGHREN Poses a Risk of Flight .................................................................12

    C.   All Defendants Are a Clear Danger to the Community ......................................12

IV.  CONCLUSION ..................................................................................................................16

## I. INTRODUCTION

Javier CASTRO Banegas-Medina ("CASTRO") was the leader of a fentanyl distribution organization (hereinafter referred to as the "CASTRO DTO") that pumped enormous quantities of fentanyl into the community. On May 25, 2021, law enforcement executed search warrants on two of the DTO's stash houses and found approximately 19 kilograms of fentanyl, enough for approximately 9.5 million lethal doses.[1] ROSALES-MONTES, CRUZ-CACERES, and ROMERO-LOPEZ worked with CASTRO to distribute fentanyl. All four are citizens of Honduras.[2] After their arrest on May 25, 2021, they conspired to flee to Honduras to avoid consequences for the serious drug charges levied against them. In a recorded conversation, they said to each other that they would flee because they would rather get deported than go to jail in the United States. They also discussed how to obtain money for bail in order to flee.

The Court should take these men at their word. If they are released from detention, they will flee to avoid the serious prison sentences they face as a result of their drug trafficking activities. No conditions can keep them here to face trial. They have the means to flee to Honduras. They have connections with smugglers that can take them across the border. And they have substantial ties to Honduras and property there. All of this was revealed plainly during the wiretap interceptions of communications from CASTRO's phones. The mantra of the CASTRO DTO based on these communications was: sell as much fentanyl as you can but be ready to flee to Honduras if serious charges are brought. Indeed, on these intercepted calls, CASTRO admitted that he told his own brother, who was part of a related drug trafficking organization, to abscond from federal pretrial supervision and return to Honduras because he was facing 42 months imprisonment. CASTRO, ROSALES-MONTES, CRUZ-CACERES, and ROMERO-MONTES are all facing charges with five year mandatory minimum prison sentences and, based on the amount of fentanyl distributed, may also be subject to charges with ten year mandatory minimum prison sentences and significant advisory guidelines sentencing ranges.

---

[1] The European Monitoring Center for Drugs and Drug Addiction estimates that "the lethal dose of fentanyl in humans is 2 mg." *See* Fentanyl Drug Profile, *available at* https://www.emcdda.europa.eu/publications/drug-profiles/fentanyl_en (last visited May 31, 2021).

[2] CASTRO, ROSALES-MONTES, and CRUZ-CACERES do not appear to have legal status in the United States. ROMERO-LOPEZ may have a green card.

MEM. ISO DETENTION MOTION
21-MJ-70900-MAG; 21-MJ-70903 MAG                              1

CASTRO also appeared to be preparing to return to Honduras, where he apparently has at least one large property, recently stating that he sent one of his cars down there. On one intercepted communication CASTRO said he keeps between $40,000 to $60,000 saved in case he gets arrested, and that he will get a lawyer to get him out, and then he will just "take off for down there." ROSALES-MONTES, CRUZ-CACERES, and ROMERO-LOPEZ are all likely to do the same. There are no conditions of release that can be fashioned by the Court that will keep these men here.

LAUGHREN was a fentanyl re-distributor who purchased fentanyl from the CASTRO DTO to distribute it to others, manufactured guns, and traded guns for fentanyl. LAUGHREN is also facing serious charges, with a maximum twenty-year prison sentence, and appears to be a fentanyl addict without legitimate employment. For these reasons, LAUGHREN also poses a risk of flight.

Finally, all five of these defendants pose a clear danger to the community if released and no combination of conditions could adequately safeguard the community. Fentanyl is an extremely dangerous drug and the CASTRO DTO distributed enormous amounts while bragging about its lethality. In 2020, more people in San Francisco died of overdoses involving fentanyl than COVID-19. *See* Yoohyun Jung, *S.F. on Course for Record-Breaking Number of Drug Overdoses in 2021*, S.F. Chronicle, May 22, 2021, (fentanyl was involved in 72.3% of San Francisco's 712 accidental overdose deaths in 2021; COVID-19 killed fewer than 300), *available at* https://www.sfchronicle.com/local/article/San-Francisco-is-on-course-for-a-record-breaking-16195217.php. Pumping fentanyl into the community is very dangerous and communications intercepted during the wiretap investigation make it clear that the CASTRO DTO would continue to distribute fentanyl if they are released from detention and do not flee to Honduras. Further, the CASTRO DTO traded fentanyl for firearms, which only enhanced the danger it posed to the community and would pose again if its members were released from detention.

II.   BACKGROUND

   A.   Law Enforcement Seizes 19 Kilograms of Fentanyl from CASTRO DTO

The CASTRO DTO trafficked significant amounts of deadly fentanyl in the Northern District of California and beyond. On May 25, 2021, law enforcement executed search warrants on five locations associated with the CASTRO DTO and arrested five individuals. The search locations included

residences in Oakland and San Leandro, where members of the CASTRO DTO resided and from which they distributed fentanyl. Investigators found approximately 19 kilograms of fentanyl in and surrounding those residences. A significant quantity of the fentanyl that was found had been hidden inside fence posts surrounding the Oakland property. Photographs of some of that fentanyl are copied below:







During the searches, investigators also found approximately $36,000 in bulk currency. During a search

MEM. ISO DETENTION MOTION
21-MJ-70900-MAG; 21-MJ-70903 MAG                    3

of a hotel room registered to LAUGHREN, investigators found approximately a half ounce of fentanyl, two Glock-style firearms, an AR-style pistol, the lower receiver for an AR-style rifle, and gun making equipment.[3]

Evidence obtained throughout the course of the investigation of the Castro DTO, which included wiretap interceptions, revealed that each member of the CASTRO DTO played an important role. CASTRO, the leader, had two primary associates, Elmer ROSALES-MONTES ("ROSALES-MONTES") and Jose Ivan CRUZ-CACERES ("CRUZ-CACERES"), who prepared fentanyl and delivered it to customers. In order to sell fentanyl at a variety of price points, the CASTRO DTO would mix it to different levels of potency and then dye it certain colors, which corresponded to the different potencies. Keny ROMERO-LOPEZ ("ROMERO-LOPEZ") lived with CASTRO, registered one of the vehicles used by CASTRO to traffic fentanyl, and a large quantity of fentanyl was found in his room, along with dyes consistent with coloring fentanyl. William Joseph LAUGHREN Jr. ("LAUGHREN") was a re-distributor of fentanyl who regularly purchased fentanyl from the CASTRO DTO (sometimes in exchange for firearms purchased at gun shows) in order to distribute it to others in the Northern District.

The fentanyl distributed by the Castro DTO was kept in CASTRO's, ROSALES-MONTES', CRUZ-CACERES', and ROMERO-LOPEZ's residences in Oakland and San Leandro, which doubled as stash houses. The CASTRO DTO's distribution chain flowed through the Bay Area, including San Francisco, Concord, and Oakland, and beyond to re-distributors outside of the Northern District of California.

**B.      Law Enforcement Intercepted Wire Communications Regarding CASTRO DTO's Ties to Honduras**

Wire communications intercepted by investigators throughout the wiretap investigation showed that the CASTRO DTO distributed fentanyl with flagrant disregard for the deadly impact it could have on the community, and that the DTO members had a clear plan to flee from justice if apprehended.

---

[3] The government notes that LAUGHREN stated that only the AR bottom and gun manufacturing equipment belonged to him. Another individual stated that the other three firearms belonged to that individual. LAUGHREN also identified the other three firearms as belonging to that individual.

MEM. ISO DETENTION MOTION
21-MJ-70900-MAG; 21-MJ-70903 MAG                4

On April 26, 2021, law enforcement intercepted a call CASTRO received a call from Honduran telephone number. During the call CASTRO stated that he was paying 10,000 to bring a friend up, who he said was in Guatemala and would be in Mexico the next day. CASTRO said that he would have to pay another 5,000 or 6,000 to get him up to the Bay Area once he crossed into the United States.

On May 3, 2021, law enforcement intercepted a call CASTRO made to a woman. During the call, the woman spoke about another man who had just got out of jail and had court later in the week. The woman said the man would get an ankle monitor and he would probably go back to Honduras because he already had everything there and he was only in the United States because of a woman. CASTRO said that his brother also had court and the lawyer called him to offer 42 months straight. ***CASTRO told the woman that he told his brother he "should get the hell out to Honduras."*[4]** CASTRO and the woman then discussed how men go back to Honduras and the women there jump all over them. Later in the call, CASTRO said that two people each gave him about $40,000 and the same morning they were arrested. CASTRO said that he had thought his turn was coming but it apparently had not because he would have been arrested already. CASTRO said that one of the men was in jail for only ten days and came out with an ankle monitor. CASTRO said the man stayed with him for about two months, that CASTRO supported the man, and that ***CASTRO gave the man $5,000 to "go back down."*** CASTRO and the woman then discussed how court appearances stretch for long periods of time and CASTRO said that when he was in jail his court appearances were six months apart. The two laughed about the time they spent in jail and how they were never sentenced and were just sent back to Honduras. CASTRO said that ***he keeps between $40,000 to $60,000 saved in case he gets arrested, and that he will get a lawyer to get him out, and then he will just "take off for down there."***

CASTRO's comments are consistent with his brother absconding from his federal criminal case in this district. In December 2020, CASTRO's brother was charged with conspiracy to distribute and possess with the intent to distribute fentanyl (21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C)), and Illegal Use

---

[4] The descriptions of intercepted calls and quotations are based on initial summaries prepared by monitors. As such, it is possible that there will be some discrepancies between the descriptions set forth in this memorandum, and the final transcripts if/when those transcripts are prepared. In most cases, only portions of the selected telephone calls and text messages have been summarized or quoted. Further, some conversations occurred in Spanish and were summarized in English by Spanish-speaking monitors.

of a Communication Facility (21 U.S.C. § 843(b)).  *United States v. Cruz et al.*, 20-cr-480 WHA.  The charges stemmed from a wiretap investigation in which CASTRO was intercepted communicating about supplying a large amount of fentanyl, although, at the time, law enforcement had not identified CASTRO as the individual whose communications were being intercepted.  CASTRO's brother was released of a $20,000 unsecured bond with electronic monitoring and a curfew.  CASTRO' brother subsequently absconded from pretrial release and a warrant for his arrest was issued.

On May 6, 2021, law enforcement intercepted a call CASTRO received from a Honduran number.  During the conversation, CASTRO appears to discuss how he sent money to buy more land in Honduras, and he wanted to add a wall and gate around the perimeter of his Honduran property.  CASTRO stated that the land value is approximately 150 pesos per 75,000 square feet, and he has about 2 million square feet of property.  CASTRO and the other man talked about an impressive home with a beautiful staircase that belongs to CASTRO.

On May 10, 2021, law enforcement intercepted a call CASTRO received from a Honduran number.  During the conversation, CASTRO said he wanted to buy another piece of land in Honduras.  CASTRO said that he had sent his "other car" to Honduras the day before.

    **C.**    **After Their Arrests, Members of the CASTRO DTO Discuss Plan to Flee to Honduras**

On May 25, 2021, CASTRO, ROSALES-MONTES, CRUZ-CACERES, and ROSALES-MONTES were arrested during the execution of the search warrants described above.  After their arrest, the four men were recorded having a conversation during which they stated that if they were released, ***they would leave to Honduras, and that they would rather get deported than go to jail in the United States***.  They further stated that they hoped they would get bail.  ROMERO-LOPEZ stated that he had multiple properties in Honduras, including animals, that he could sell to get the money to pay for bail.

    **D.**    **Law Enforcement Intercepts Wire Communications Regarding Firearms and Fentanyl**

On April 22, 2021, law enforcement intercepted text messages to CASTRO in which an individual asked CASTRO if he was available now in connection with an apparent fentanyl transaction.  CASTRO responded, "Of course I am available, as this is my job."

On April 26, 2021, law enforcement intercepted the following text message conversation, between CASTRO and a re-distributor:

> UM-5890: I'm going to need some shit now, but those dudes say that a lot of people complained that the stuff from last time was too low.
>
> CASTRO: Uh, no, but right now we have some-- fuck, which are lethal!
>
> UM-5890: Okay, yes, so I am going to want 15, and two of the pink and one and a half of the purple.

On May 1, 2021, law enforcement intercepted a call between CASTRO and a woman during which the woman asked what kinds of fentanyl CASTRO had. CASTRO and the woman discussed someone dying. CASTRO then said he now had really good stuff. CASTRO then asked about another guy. The woman replied that the guy went to the hospital but is okay now. Later in the conversation CASTRO said that he had a really good price: $600 per ounce and that he got really good new stuff— really good blue and very good yellow. CASTRO said that the blue is "strong."

Also, on May 1, 2021, law enforcement intercepted a call CASTRO received from a man hereinafter described as UM-3070. UM-3070 said that "guys were out with the guns." CASTRO asked UM-3070 if he took his gun out too. UM-3070 said that he was going to shoot an unknown man but that there were other guys with that unknown man and UM-3070 did not know if the other guys would get involved. CASTRO told UM-3070 to hold onto the gun and to shoot at the unknown man if the unknown man shoots at UM-3070. UM-3070 agreed and told CASTRO to come out with "his" and shoot at them too if CASTRO heard shots. CASTRO told UM-3070 to hold onto the gun and it was not a problem. Later in the call CASTRO and UM-3070 discussed how the guys associated with a van played dirty. CASTRO said that he would "call to have squadron sent up there."

On May 15, 2021, law enforcement intercepted another call between CASTRO and UM-3070. UM-3070 said he would come by CASTRO's place to pick up "one of those things." CASTRO said he had the guns. UM-3070 said he needed it because someone brought a "black guy" to beat him up. CASTRO called the "black guy" a name and said they could beat him up without needing a gun.

On May 18, 2021, law enforcement intercepted another call between CASTRO and UM-3070. CASTRO asked UM-3070 if he could bring CASTRO's gun back because CASTRO was getting an AR

and he wanted to "send them out right away." After, UM-3070 thanked CASTRO for letting him borrow the gun, CASTRO said that it was not a problem and that he had another one, a 35, which CASTRO planned to keep for himself because he realized he needed to be protected. CASTRO explained that the gun was a Glock 9 with 35 bullets. CASTRO said that he would have a safe-box made in his car to keep it there with him, because he saw how "the fucking blacks will shoot you without giving it a second thought." CASTRO said that he bought it for $1,200. UM-3070 asked CASTRO to sell the gun to him and CASTRO mentioned again that he was buying an AR that day for $750.

   E. **LAUGHREN's Routine Purchases of Fentanyl from the CASTRO DTO and Involvement with Firearms Trafficking**

On May 1, 2021, law enforcement intercepted text messages between CASTRO and LAUGHREN in which LAUGHREN agreed to provide CASTRO with a Glock 9mm in exchange for one ounce of blue fentanyl and $400.

On May 25, 2021, law enforcement executed a search warrant on a hotel room registered to LAUGHREN. LAUGHREN was not present but two other individuals were. Investigators found in the room approximately a half ounce of fentanyl, two Glock-style firearms, an AR-style pistol, the lower receiver for an AR-style rifle, and gun making equipment. One of the occupants of the room said that some of the firearms were his, and that LAUGHREN was his fentanyl dealer. LAUGHREN was later apprehended and in a post-*Miranda* interview he admitted that his job is selling fentanyl, that he manufactures firearms and trades them for fentanyl, and that the AR-15 lower receiver and the gun manufacturing equipment found in the hotel room belonged to him. Below are images if the AR-15 lower receiver and the gun manufacturing equipment:

 

## III.    DISCUSSION

To detain a defendant pending trial, the Court must find by a preponderance of the evidence that there are no conditions that will reasonably assure the defendant's appearance as required, or find by clear and convincing evidence that there are no conditions which reasonably will assure the safety of any person or the community.  18 U.S.C. § 3142(f).

In cases such as this, where there is probable cause to believe that the Defendant violated the Controlled Substances Act and faces a maximum of 10 years or more in prison, there is a rebuttable presumption that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community.  *Id.* § 3142(e)(3)(A).  The burden of production then shifts to the defendant.  *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (citing *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)).  Although the presumption is rebuttable, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir. 1985) (Breyer, J.).  In other words, the presumption is not so weak that whenever the defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id.*  Since a defendant can "always provide the magistrate with *some* reason … a 'bursting bubble' approach might render the presumption virtually meaningless, contrary to Congress's clear intent." *Id.* (emphasis added).

If the Court finds that the defendant has rebutted the statutory presumption of detention, the Court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

Here, none of the defendants can overcome the presumption in favor of detention.  CASTRO's, ROSALES-MONTES', CRUZ-CACARES', and ROMERO-LOPEZ'S international ties, their plan to flee to Hondurans, and the significant penalties they face, establish that no conditions of release can mitigate their risk of flight.  Moreover, the nature and circumstances of the current offense, specifically

the volume of fentanyl involved in the crime and the firearms involved show that all the defendants pose a considerable danger to the community that cannot be mitigated by conditions.

### A. CASTRO, ROSALES-MONTES, CRUZ-CACERES, and ROMERO-LOPEZ Pose a Risk of Flight that Cannot be Mitigated by Conditions

The nature and circumstances of the offenses, the weight and the evidence, and the defendants' history and characteristics demonstrate by a preponderance of the evidence that CASTRO, ROSALES-MONTES, CRUZ-CACERES, and ROMERO-LOPEZ pose a risk of flight that cannot be mitigated.

CASTRO, ROSALES-MONTES, CRUZ-CACERES, and ROMERO-LOPEZ are all facing serious drug charges that will subject them to a minimum prison term of five years. All four are also likely subject to more serious charges that could subject them to a minimum prison term of ten years. The weight of the evidence against them is extremely strong. CASTRO's wire communications were intercepted, providing significant detail on the workings of the CASTRO DTO. Investigators saw CASTRO conducting hand-to-hand transactions consistent with drug transactions and later seized fentanyl from the purchaser on numerous occasions. Investigators observed ROSALES-MONTES and CRUZ-CACERES movements were consistent with them distributing fentanyl to re-distributers intercepted on the wiretap. On one occasion that ROSALES-MONTES and CRUZ-CACERES were delivering fentanyl to a customer, they were stopped by law enforcement and a large amount of fentanyl was found in their car. A large amount of fentanyl was found in the bedroom that ROMERO-LOPEZ said belonged to him and dyes that can be used in connection with distributing fentanyl were found in a safe in ROMERO-LOPEZ's room, which he also stated belonged to him. Approximately 19 kilograms of total fentanyl was found in and around the four men's residences.

After they were arrested on May 25, 2021, the four men discussed a plan to flee to Honduras. They said they would rather go back to Honduras then spend time in a United States jail. This is exactly what CASTRO's brother appears to have done at CASTRO's instruction in connection with CASTRO'S brother's recent federal case. The Court should take these men at their word. In addition to their stated intentions, it is logical that these men, facing likely deportation, would prefer to return to Honduras before serving lengthy prison sentences rather than after. The government is aware of no significant community ties that would keep the defendants in the United States. They do not appear to have any

MEM. ISO DETENTION MOTION
21-MJ-70900-MAG; 21-MJ-70903 MAG                    10

legitimate employment. Based on the way the CASTRO DTO was run, it appears likely that most of their close contacts are also involved in drug trafficking. The four men appear to have ties to Honduras that would make it appealing for them to flee, and also have the means and contacts with smugglers necessary to successfully flee to Honduras.

CASTRO and ROMERO-LOPEZ appear to both have significant property in Honduras. In one intercepted call, reference was made to CASTRO's "impressive" home in Honduras with a "beautiful staircase." CASTRO stated he owns about 2 million square feet of property and discussed farming corn. CASTRO discussed buying more property and adding a gate or a wall around the perimeter. And he stated that he recently sent one of his cars to Honduras. In the recorded conversation on May 25, 2021, ROMERO-LOPEZ said that he had multiple properties in Honduras and animals. Whether ROSALES-MONTES and CRUZ-CACERES similarly own property in Honduras is unknown to the government. The government notes, however, that ROSALES-MONTES and CRUZ-CACERES lived with CASTRO at his residences in Oakland and San Leandro and there is not reason to think that they could not similarly do so in Honduras.

Finally, CASTRO appears to have contacts with smugglers and the resources to make flight to Honduras a reality. In one intercepted communication, CASTRO discussed paying money to bring a friend up to the Bay Area who was going through Guatemala to Mexico to the United States. The payments CASTRO mentioned appear consistent with him paying smugglers. Further, approximately $36,000 in cash was found during the execution of the search warrants. CASTRO's business appears to have generated significant revenue and he may keep cash hidden in multiple locations in anticipation of law enforcement activity. Indeed, in one intercepted communication, CASTRO said he keeps between $40,000 to $60,000 saved in case he gets arrested, and that he will get a lawyer to get him out, and then he will just "take off for down there." During the recorded conversation discussed above, ROMERO-LOPEZ stated he could sell properties and/or animals in Honduras to get bail money.

CASTRO, ROSALES-MONTES, CRUZ-CACERES, and ROMERO-LOPEZ will flee to Honduras if they are release. The evidence proffered by the government goes far beyond its burden. These men have made clear that there are no conditions that can keep them here. They have clearly stated that they will forfeit bail for a chance to avoid jail and return to Honduras, where they appear to

have significant connections and resources.

### B. LAUGHREN Poses a Risk of Flight

LAUGHREN is also facing serious drug trafficking charges. The weight of the evidence is also extremely strong against LAUGHREN. His communications with CASTRO were intercepted on numerous occasions, consistent with LAUGHREN purchasing between a half-ounce and an ounce of fentanyl from CASTRO on a regular basis. During the course of the wiretap investigation, LAUGHREN appears to have purchased over one half-pound of fentanyl and appears to have traded a firearm for fentanyl on at least one occasion, which has the potential to subject him to charges under 18 U.S.C. § 924(c) and its corresponding five year mandatory-minimum consecutive sentence. LAUGREN was also stopped by law enforcement after one hand-to-hand transaction with CASTRO and approximately a half-ounce of fentanyl was found on LAUGHREN's person. LAUGHREN also appears to be a fentanyl addict without legitimate employment. Given these facts, the government believes LAUGHREN poses a risk of flight, although it is possible that information provided through a full bail study could demonstrate that conditions could be crafted that would mitigate that risk.

### C. All Defendants Are a Clear Danger to the Community

The CASTRO DTO filled over 100 orders for suspected fentanyl between approximately April 21, 2021 and May 19, 2021. As described in the criminal complaint, fentanyl, a Schedule II controlled substance is a highly potent synthetic opioid. It is about 50 times stronger than heroin and about 100 times stronger than morphine. Fentanyl can be distributed in many forms, including, powder, patches, and mixed into counterfeit pills. Data compiled by the DEA shows that availability of fentanyl in the United States has drastically increased from 2013 to the present.[5] According to the Centers of Disease Control and Prevention ("CDC") in 2019, opioids were involved in 49,860 overdose deaths.[6] Synthetic opioids, such as fentanyl, accounted for nearly 73% of all opioid-involved deaths in 2019. Two out of

---

[5] Drug Enforcement Administration. 2019 National Drug Threat Assessment, December 2019, pp. 9-11, available at https://www.dea.gov/sites/default/files/2020-02/DIR-007-20%202019%20National%20Drug%20Threat%20Assessment%20-%20low%20res210.pdf (last accessed Dec. 7, 2020).

[6] Synthetic Opioid Overdose Data, Centers for Disease Control and Prevention, available at https://www.cdc.gov/drugoverdose/data/synthetic/index.html (last accessed May 20, 2020).

three of those overdoses involved synthetic opioids such as fentanyl.[7] According to the CDC data, the largest increase in death rates from 2018 to 2019 involving synthetic opioids, 67.9%, occurred in the Western United States.

The CASTRO DTO's distribution chain ran throughout the Bay Area, including San Francisco, and beyond. It seems likely that the fentanyl the CASTRO DTO distributed contributes to the significant public health problem that San Francisco is facing in connection with fentanyl. Recent articles in the San Francisco Chronicle have detailed the deadliness of fentanyl. Indeed, in 2020 when the world was upended by the COVID-19 pandemic, fentanyl overdoses appear to have caused more deaths than COVID-19, and 2021 so far is on pace for even more overdose deaths than 2020. The paper presented a graph showing the increase in overdose deaths, which is copied below:[8]



//

//

//

---

[7] Drug Overdose Deaths, Centers for Disease Control and Prevention, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last accessed May 20, 2020).

[8] All images copied below are from, Yoohyun Jung, *S.F. on Course for Record-Breaking Number of Drug Overdoses in 2021*, S.F. Chronicle, May 22, 2021, *available at* https://www.sfchronicle.com/local/article/San-Francisco-is-on-course-for-a-record-breaking-16195217.php.

MEM. ISO DETENTION MOTION
21-MJ-70900-MAG; 21-MJ-70903 MAG          13

Fentanyl is involved in a substantial number of those overdose deaths:



Further, overdose deaths involving fentanyl increased substantially in January to April 2021 as compared with the same period in 2020:



The CASTRO DTO was distributing an enormous quantity of fentanyl. Approximately 1.3 kilograms was seized over the course of multiple weeks while law enforcement was intercepting CASTRO's wire communications, which likely represents a tiny portion of the fentanyl the CASTRO

MEM. ISO DETENTION MOTION
21-MJ-70900-MAG; 21-MJ-70903 MAG                    14

DTO was trafficking during that period.  And during the execution of search warrants on May 25, 2021, law enforcement found approximately 19 kilograms of fentanyl at CASTRO DTO stash houses, which is one of the largest seizures of fentanyl in recent memory in the Northern District.  Indeed, the seizures during the investigation of the CASTRO DTO represent almost four times the amount of total fentanyl seized in San Francisco's Tenderloin neighborhood, where San Francisco's drug activity is concentrated, in all of 2020:



*See* Yoohyun Jung, *San Francisco's Seizures of Deadly Fentanyl are Skyrocketing.  Is it Impacting Supply?*  S.F. Chronicle, May 28, 2021, *available at* https://www.sfchronicle.com/local/article/San-Francisco-s-seizures-of-deadly-fentanyl-are-16208702.php; *see also* Trisha Thadani, *A Mother Who's Losing Her Son to Fentanyl Says S.F. is Failing to Help Drug Users.  So She Protested the Dealers.* S.F. Chronicle, May 27, 2021 (Without the city's robust harm reduction services, it's likely thousands more would be dead: At least 3,500 overdoses were reversed last year with Narcan, according to the Drug Overdose Prevention and Education project), *available at* https://www.sfchronicle.com/politics/article/A-mother-who-s-losing-her-son-to-fentanyl-says-16206001.php.

      CASTRO not only appears to have cared little about the lethality of fentanyl, he used it as a selling point.  In one intercepted communication, he bragged about how the fentanyl he had was "lethal!" in response to a comment about people complaining the "stuff from last time was too low."  CASTRO was also intercepted discussing someone dying and another person being in a hospital, and then went on to talk about how he had a really good price for his fentanyl and his blue fentanyl was "strong."

CASTRO's intercepted communications suggest that if her were released and did not flee (which he will) he would continue to distribute fentanyl, significantly endangering the community. The other defendants are likely to do the same.

The connection between firearms and the CASTRO DTO further increase the danger posed by the organization to the community by its members. CASTRO appears to have traded fentanyl for guns with LAUGHREN, who admitted to manufacturing firearms. CASTRO also discussed firearms at length on intercepted communications and discussed the possibility of shooting people.

For all of the above reasons, there is clear and convincing evidence that CASTRO, ROSALES-MONTES, CRUZ-CACERES, ROMERO-LOPEZ, and LAUGHREN would be a danger to the community if released and no conditions of release could adequately address this danger.

**IV.     CONCLUSION**

The defendants should be detained pending trial for the reasons set forth above.

DATED: May 31, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

_____/s/_____
NOAH STERN
Assistant United States Attorney
BENJAMIN K. KLEINMAN
Special Assistant United States Attorney